IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | : | CIVIL ACTION |
| COMMISSION | : | |
| | : | No. 06-2274 |
| v. | : | |
| | : | |
| FREDERICK W. ANTON, III | : | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Juan R. Sánchez, J.**                                                                 **April 23, 2009**

In this insider trading case, the Securities and Exchange Commission (SEC) asks this Court to find Frederick W. Anton, III, as Chairman of PMA Capital Corporation's Board of Directors, unlawfully tipped material, nonpublic information about PMA to outsider David L. Johnson in violation of the securities laws.[1]  Anton argues the SEC failed to prove he violated the securities laws because Johnson is not credible, and, at the time he spoke to Anton, Anton was not in possession of the information he is alleged to have known and disclosed.  Because the SEC has not met its burden to show by a preponderance of the evidence that Anton made, and benefitted from, the alleged disclosure, this Court finds no violation of the securities laws.

**FINDINGS OF FACT**

In 2003, PMA Capital Corporation was an insurance holding company, publicly traded on the NASDAQ, with subsidiaries providing workers' compensation, disability, commercial property, and casualty insurance.  PMA was engaged in two main businesses, the primary commercial insurance business known as PMA Insurance Group, and the reinsurance business known as PMA

---

[1]The SEC alleges Anton violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under Section 10(b) of the Exchange Act.

Re.  Beginning in 2000 and continuing into 2003, PMA Re experienced a higher than expected number of reported claims from the companies it insured.  As a result, in the years between 2000 and 2003, including the final quarter of 2002, PMA Re several times increased the amount of its loss reserves – an estimate of future amounts needed to pay the reported and unreported insurance claims of the companies insured.  On February 25, 2003, A.M. Best, the primary rating agency for the rating of insurance and reinsurance companies, reduced PMA's rating from A to A-minus.[2]

Johnson, a retired former PMA executive, was a sophisticated investor who regularly followed PMA's stock price, reviewed the company's quarterly financial reports, and attended annual meetings.  On October 22 or 23, 2003, Johnson read a Credit Suisse First Boston analyst report regarding PMA's financial condition, sent to him by John Webster, a retired long-time former PMA colleague.  The report stated Credit Suisse had reduced its classification for PMA from "Neutral" to "Underperform."  The report explained:

> The current valuation of the stock reflects concern over the competitive position of the company, the adequacy of loss reserves, the company's capital position, and the A.M. Best rating downgrade.  On February 25th, A.M. Best reduced the rating of PMA's reinsurance business from A to A-.  In addition, the valuation also represents the fact that five of the company's last quarters have been disappointing.  We remain wary of the need to further add to reserves.  The second quarter 2003 was the third straight quarter that operating earnings were reduced by additions to reserves for earlier losses at PMA Re.  In total, these additions to reserves were $65 million.

Ex. 2.

Johnson subsequently called John W. Smithson, the President and CEO of PMA, for verification of the report.  Johnson asked Smithson whether the report was "factual," N.T. 11/10/08,

---

[2]An insurance company's rating is a credit rating, reflecting a company's ability to pay claims. Multiple increases of an insurance company's loss reserves can result in a reduction in the company's rating.

108: 3, 8, and Smithson replied that it was, but added that the company was not always treated kindly by Credit Suisse.  Smithson, whose testimony is credible, testified Johnson also asked how the company was doing, and Smithson said PMA would be reporting its third quarter earnings in the normal course and there would be more information available then.  Then, between 10:00 a.m. and 11:00 a.m. on Friday, October 31, 2003, Johnson called Anton at his office.[3]

That same day, following his conversation with Anton, Johnson sold 20,000 shares of PMA stock.  On Sunday, November 2, 2003, Johnson advised his son and daughter to sell their shares of

---

[3]This was the last time Johnson spoke to Anton.  Regarding his relationship with Anton, Johnson testified he considered Anton and himself to be friends.  This characterization of their relationship, however, is inconsistent with his own testimony regarding the details of their relationship as well as with Anton's testimony.  As of 2008, Johnson had known Anton for about 35 years, but on only one occasion in the mid-1970s had Johnson been invited to Anton's home for dinner. Outside of stockholders meetings, meetings of retired employees, and lunches once or twice a year with other shareholders that included Anton, Johnson testified he did not have any relationship with Anton.  Johnson testified he did not have any means of contacting Anton other than at Anton's office. Johnson could not recall any occasions when he met Anton on a personal or social level outside of the company shareholder relationship.  Johnson testified Anton had treated him just as he had treated the other PMA retirees in a similar situation, and never befriended Johnson more closely than anyone else.  When asked whether he knew the name of Anton's wife, Johnson replied uncertainly, "I believe it was Betty."  N.T. 11/10/08, 61:16.  Johnson further testified he had never received a gift from Anton, and Anton had never given Johnson any financial advice other than to say on a few occasions that Johnson had "too many eggs in one basket."  As for Anton, when asked whether he considered himself a friend of Johnson, he responded:

> I wouldn't consider myself a friend of any of these people.  My relationships were professional relationships with all of these people.  Now, some of the people I spent more time with because my passion is golf and if they played golf . . . I played golf with the people that played golf.  No, I would not – and the thing is I played golf and I also at some of this time was a heavy drinker and I went drinking with people.  I didn't spend an inordinate amount of time with Mr. Johnson.

N.T. 11/12/08, 51, 2-15. Anton testified Johnson was neither a golfer nor a drinker.  Anton could not recall spending any social time with Johnson.  Outside the offices of the insurance company, Anton stated he might have spent "one one hundredth of the time" with Johnson.  Anton also did not remember ever having given Johnson a gift.

PMA stock.  On the following Monday, November 3, 2003, Johnson sold an additional 20,000 shares.  The shares were sold at an average price of $13.17.  Johnson's daughter did not sell her shares, but his son sold his PMA stock on November 3, 2003.  On the morning of November 4, 2003, PMA announced it would be increasing its loss reserves by about $150 million and planned to suspend dividends.  PMA stock closed that day at $5.03 per share.  Johnson was able to avoid a total loss of $325,305.[4]  Johnson's son was able to avoid a loss of $56,028.

On September 7, 2005, the SEC filed a complaint against Johnson, alleging Johnson had committed insider trading by selling stock after obtaining insider information and prior to PMA's announcement regarding its loss reserves and dividends.  Johnson settled the action with the SEC by paying a total of $786,449, including disgorgement of $381,334, the amount of losses he and his son avoided,  prejudgment interest of $23,781, and a civil penalty of $381,334.  Johnson was also permanently enjoined from further violations of the antifraud provisions of the federal securities laws.[5]  On May 31, 2006, the SEC filed this action against Anton, alleging tipper liability for his disclosure to Johnson of the material, nonpublic information that PMA would be eliminating its dividend and that PMA Re would be increasing its loss reserves.

To determine what was disclosed during the conversation between Johnson and Anton on October 31, 2003, the only direct evidence before this Court are the testimonies of Johnson and Anton.  Neither account of the conversation, however, is credible.  Johnson's testimony regarding his October 31, 2003 conversation with Anton cannot be credited because of inconsistencies in his

---

[4]On November 5, 2003, Johnson sold an additional 10,000 shares of PMA stock, but did not avoid any losses.

[5]Johnson's settlement with the SEC cannot be used as evidence to establish Anton was a participant in the insider trading alleged against Johnson.

stated reasons for calling Anton.  Johnson has provided three different reasons for calling Anton on

October 31, 2003.   Under direct examination in court, Johnson testified his primary reason for

calling Anton was to tell him that Webster, a former colleague, was in the terminal stages of cancer.

During cross examination, Johnson testified that at the time he spoke to Anton, Johnson had known

about the condition of Webster's illness for several weeks, having spoken to Webster sometime in

September of 2003.  Johnson testified he and Anton then spoke about Halloween because it was a

very important holiday for Anton.  Johnson later testified, under direct examination, it had not been

Webster's illness but Halloween that had prompted his call, explaining: "Mr. Anton really liked that

holiday, so that's probably the reason I called him in the first place, it just happened to be one of his

favorite holidays, and so we talked about that."  N.T. 11/10/08, 74, 3-6.  In explaining why

Halloween was so important to Anton, Johnson testified Anton often hosted Halloween office parties

where employees would bring their children in costumes.  When Johnson was deposed by the SEC

on March 10, 2005, however, Johnson did not mention Halloween.  During that deposition, Johnson

testified he called Anton because he had seen a negative report from Credit Suisse First Boston.

Johnson explained how he had viewed the Credit Suisse report as follows:

> It indicated that they felt because of the last several quarters that they had to
> strengthen reserves, they mentioned that, that they had been strengthening.  They felt
> it would be further strengthening in the future.  Also they indicated that the [A.M.]
> Best rate . . . had been reduced in the company and they also mentioned the profits
> by quarter.  The last seven quarters, I believe, had been profitable, two of the seven,
> and because of these things they had reduced the rating from a neutral to an under
> perform[] which is a sale.

N.T. 11/10/08, 118: 3-15.  Johnson confirmed in court he had not stated during his deposition that

he called Anton on October 31, 2003, to discuss Halloween.

At trial, Johnson denied he called Anton for information regarding PMA's financial health.

He testified he did not ask Anton how the company was doing and asked only in a general manner how things were going. Johnson maintained he was simply looking for good news. Asked under cross examination what good news he had been seeking, Johnson responded he was looking for anything positive, and it could have been good news about Anton's golf game, his family, the company, or his political activities. Johnson insisted: "It was a general question, it could have been anything." N.T. 11/10/08, 123:20-21.

Johnson's assertion he did not call Anton for the purpose of seeking information regarding PMA is further undermined by the fact that, just a few days before calling Anton, Johnson called Smithson, who, as President and CEO of PMA, was another corporate insider. Johnson called Smithson to ascertain whether the Credit Suisse report was "factual." N.T. 11/10/08, 108:3. Johnson, under cross examination, insisted he had "simply wanted verification that this was accurate information." N.T. 11/10/08, 110:7-8. Rather than calling a stockbroker, another shareholder of PMA stock, or his own son who worked in financial services, or doing any research of his own to determine whether the report was correct, Johnson called the head of the company. Johnson testified he called Smithson because Smithson was speaking from a position of knowledge. Likewise, when Johnson called Anton, contrary to Johnson's testimony, it was more likely for the purpose of seeking information Johnson knew Anton would have as Chairman of the Board of Directors. Johnson's account of the October 31, 2003, conversation, therefore, cannot be credited.[6]

---

[6]This Court also finds doubtful Johnson's testimony he was motivated to sell his shares on October 31, 2003, and thereafter, solely due to Anton's disclosure PMA would be eliminating the dividend. Johnson testified that following the discussion of Webster and/or Halloween he asked Anton how things were going, and Anton said he would be retiring, "things had not been going well with the company," PMA was adding to its reserves and eliminating the dividend, and Johnson had "too many eggs in one basket." N.T. 11/10/08, 75: 1-13. Johnson testified he did not say anything to Anton in response. Johnson testified he found the news "devastating," and that it was Anton's

disclosure that PMA would be eliminating its dividend that motivated him to sell his stock. 11/10/08, 77: 1; 78: 20-25. Johnson said he was "panic stricken" by this news because the dividends he received from his PMA stock amounted to more than $160,000 of his yearly income.  N.T. 11/10/08, 127:20; 128.

In fact, it was as early as the summer of 2003 when Johnson began planning on selling his shares.  Following a shareholders meeting he attended in April 2003, and after reviewing PMA's annual report, Johnson realized PMA would have to increase its loss reserves substantially.  Johnson was "alarmed" by this.  N.T. 11/10/08, 102: 23-25.  Therefore, in the summer of 2003, to begin a process of diversification, Johnson placed 87,000 of the 400,000 shares of PMA stock he owned into his Vanguard brokerage account, an account that had been open for five or six years, which would allow him to sell the stock quickly.  Johnson did not sell the stock immediately because he hoped the stock price would rise.  At that time, the share price was low compared to what it had been in the past.  Then, when Johnson read the Credit Suisse report in October 2003 and learned that PMA was adding to its reserves, he was again "alarmed."  N.T. 11/10/08, 106:20.  Johnson testified he interpreted Credit Suisse's reduction of PMA's rating from "Neutral" to "Underperform" to be a recommendation to sell the stock.  Johnson testified it had been his intention to sell all 87,000 shares over a five-day period after October 31, 2003, thinking he would spread it out over a period of time. On the three days he did sell, Johnson sold only 50,000 shares, because, Johnson explained, the stock had gone down considerably after the announcement was made.  Johnson was tempted to sell more, but the price seemed to level out at five dollars a share, so he did not sell more at that time.  Johnson agreed that his sales were, in fact, simply further development of the plan he had put in place in the summer of 2003.  Under cross examination, Johnson insisted he was both panic-stricken and selling pursuant to an orderly diversification program.

This Court finds it reasonable to believe Johnson knew PMA Re had increased its reserves in the final quarter of 2002, and knew another increase was likely from his review of the Credit Suisse report.  Johnson also knew an increase in loss reserves could reduce an insurance company's profitability, ability to pay dividends, stock price, and rating.  After Johnson's calls to Smithson and Anton failed to assuage his alarm, Johnson decided to sell his stock before the company's third quarter results would be published, as he knew they would be, in November 2003.  Johnson testified he knew the company's performance was published on a quarterly basis, and knew the company's results for the third quarter, ending September 30, 2003, would be publicly announced some time in the first two weeks of November 2003.  Smithson also informed him at the end of their conversation that PMA would be publishing its quarterly report in the usual course and more information would be available then.  It was Johnson's overall awareness of PMA's financial condition and his knowledge of what would probably result that impelled him to arrange a careful plan to sell his shares and ultimately to sell a limited number of his shares over a five-day period.

In light of Johnson's orderly diversification preparations in the summer of 2003, namely, placement of 87,000 of his 400,000 shares in an account from which they could be sold quickly, this Court finds questionable Johnson's testimony that it was news of the dividend elimination from Anton that prompted him to sell his shares.  Johnson's assertions are also weakened by the fact he sold only 20,000 shares on the first day, and only a total of 50,000 of the shares he had planned to sell.  This Court therefore finds Johnson's testimony of what was discussed in his conversation with

Anton's testimony also cannot be credited.   At trial, Anton testified regarding his conversation with Johnson as follows:

> I picked up the phone, Mr. Johnson was on the line and Mr. Johnson said how are you doing or, you know, some introductory comment, I can't remember what it was, and I said well I have retired from the insurance company and I'm going to be president of the Pennsylvania Manufacturers Association. Mr. Johnson said fine and, of course, Mr. Johnson knew that I had planned to retire and be president of the Association.  He knew the relationships between the organizations.

N.T. 11/12/08, 75: 9-19.  Anton testified he did not tell Johnson the dividend would be eliminated because he had not known that would happen.  Anton also denied telling Johnson PMA was not doing well, was increasing its reserves, or that Johnson had "too many eggs in one basket."  Anton testified he only told Johnson he had retired.  During his deposition before the SEC in May 2005, however, Anton could not recall having had the conversation, let alone what was discussed.  It is unlikely his recollection in November 2008 is more reliable.  This inconsistency in recollection casts doubt on his trial testimony regarding the October 31, 2003 conversation.  For this reason, Anton's account of the October 31, 2003 conversation is discounted.

Because both Johnson's and Anton's accounts of their conversation on October 31, 2003, cannot be credited, circumstantial evidence as to the contents of the conversation must instead be considered.  At the beginning of 2003, the amount of PMA Re's loss reserves was approximately $60 billion.  In 2003, PMA's Board of Directors undertook to analyze thoroughly its loss reserve issue.  In 2003, the Board assigned Vincent T. Donnelly, PMA's President and Chief Operating

---

Anton on October 31, 2003, unreliable.

Officer of the PMA Insurance Group, to act as chief actuary and oversee PMA Re's annual internal evaluations.  In addition to its internal evaluations, PMA had an independent auditor conduct reviews of its loss reserves on an annual basis.  In 2003, Deloitte & Touche, LLP, was PMA's independent auditor. Deloitte began its review of PMA Re's reserves in the third quarter of 2003.  In early September 2003, PMA's Board of Directors, in an unusual move, also hired an actuarial firm, Bickerstaff, Whatley, Ryan & Burkhalter, Inc., to conduct an additional independent analysis of PMA's loss reserves.

As PMA's Audit Committee Chairman, Neal C. Schneider had primary oversight over the three loss reserves analyses being conducted in late 2003.  Donnelly oversaw PMA Re's internal evaluation, and reported his findings to Schneider.  Donnelly only reported to Schneider for the purposes of the internal analysis.  During the time the three analyses were underway, Donnelly received updates from Deloitte and Bickerstaff as they progressed with their evaluations.  On an organizational level, Donnelly reported directly to Smithson who, in turn, reported directly to Anton. When Donnelly received reports from Deloitte and Bickerstaff, it was his practice to report the results to Smithson, who typically kept Anton informed.

On September 30, 2003, a meeting of the Executive Committee of the Board of Directors was held, at which all members, including Anton, were in attendance.  At the meeting, Donnelly reported his preliminary recommendation, a $50-60 million reserve increase.  Smithson testified the Board's reaction was that a reserve charge of $50 million would be a relatively modest loss for the quarter and would leave a profit for 2003.  Smithson testified the $50 million reserve increase was ominous in that it was unexpected, but the company had revenues of about a billion dollars at that time, and the company could reasonably expect to maintain its A.M. Best ratings with that figure.  The meeting

9

minutes also reflect a $50-60 million increase in reserves would result in an after-tax earnings charge of $35-40 million, resulting in a third quarter operating loss of about $.50-.60 per share, but for the full year 2003, an expected operating earnings of $.45-.60 per share. Ex. 12. As of September 30, 2003, the Deloitte and Bickerstaff reserve analyses were still in progress, and neither firm had any preliminary recommendations. Donnelly stated at the Board meeting he believed the internal estimate likely would be within Deloitte's range. The meeting minutes reflect Smithson stated management was working on a plan to communicate PMA's reserve action, when known, to A.M. Best, and the communication would emphasize the reserves review had been comprehensive, PMA would be making some changes to resolve the company's financial issues, and the company's financial standing after the reserves increase would support the current A-minus rating.[7]

Schneider, whose testimony is credible, testified that beginning on October 29, 2003, Anton removed himself from the process of governance and was not involved in any management discussions or decision-making.[8] Until about September 30, 2003, Anton had been heavily involved

---

[7] At the September 30, 2003 Executive Committee meeting, the issue of a possible dividend reduction was raised, but in a discussion unrelated to the anticipated loss reserves increase. The meeting minutes reflect a suggestion of a dividend reduction was introduced under a separate topic, with discussion of the possibility of a restructuring of the business, or "run-off" of either PMA Re or the PMA Insurance Group. The Executive Committee did not discuss the possibility of a dividend reduction or elimination in connection with reserve strengthening at this meeting.

[8] Anton's own testimony is consistent with Schneider's testimony and the record, and credible on this point. Anton testified that after September 30, 2003, Schneider had taken over as Chairman of the Board of Directors. Anton's long-term plan had been to retire, thus, after September 30, 2003, Anton spent increasingly smaller amounts of time on his work as Chairman. Anton also testified PMA's Board members were dissatisfied with PMA's financial condition, and were questioning Anton's judgment, and were therefore disinclined to include Anton in their discussions at this point. The Board had also brought Schneider in and was talking to Schneider rather than to Anton about the development of the reserve estimates and their resolution. Anton understood "it was time to move on." N.T. 62-63.

in discussions with Schneider and Donnelly about possible reserve increases.  Subsequently, however, Anton prepared for retirement.

From October 29, 2003 onward, the record shows the only meeting Anton attended was a joint meeting of the Board of Trustees of PMA Foundation and the Board of Directors of PMA held at the Four Seasons Hotel before the Board of Directors dinner there on the evening of October 29, 2003.  The minutes of that meeting do not reflect the reserves or the dividend was discussed.  There is also no evidence in the record Anton was informed of the contents of any Audit Committee or the Board of Directors meetings taking place on October 29, 2003, and thereafter, where a reserves increase or a dividend elimination was discussed.

On October 29, 2003, at 10:30 a.m., an Audit Committee meeting was held after Deloitte reported to PMA, on October 28, 2003, that it estimated PMA Re's reserve increase to be in the range of $108.3-213.5 million.  Anton did not attend that meeting.  Schneider, Smithson, and Donnelly attended, but there is no evidence they or any other attendee informed Anton of the discussion at the meeting.  At the meeting, Deloitte distributed a status report of its estimates, advising the Board not to overreact to the high end of the recommended range because Deloitte was still working on its numbers.  Donnelly reported PMA's internal actuaries estimated a reserve increase between $30 million and $120 million.  Schneider testified he did not discuss Deloitte's October 28, 2003 estimates, nor any of the estimates on or after October 29, 2003, with Anton because Anton had removed himself from these discussions at that point.

October 29, 2003, at 5:00 p.m., the Board of Trustees of PMA Foundation and the Board of Directors of PMA held a joint meeting at the Four Seasons Hotel, which Anton attended.  The subject of increasing reserves or eliminating dividends was not introduced.  The Board of Directors

dinner followed.  Anton, Smithson, Schneider, and Donnelly all attended the dinner and the cocktail hour that preceded the dinner.  There is no evidence showing any information regarding PMA's loss reserves or dividend was discussed at the cocktail hour or the dinner, or that anyone informed Anton of recent developments in the reserves analyses.  At the dinner, Anton announced he would be retiring.  Prior to that, Anton had discussed retiring from time to time during the course of the year with Smithson and Schneider.  Although his resignation as Chairman of the Board of Directors did not become effective until November 6, 2003, Schneider, who replaced Anton as Chairman, took over Anton's role very quickly.  Within several days, Schneider asked for Smithson's resignation, and the following week, Schneider officially became the chief decision-maker of the company.

On October 30, 2003, a Board of Directors meeting was held.  Anton did not attend.  There is no evidence the subject matter of the meeting was later discussed with Anton.  At the meeting, Smithson led a discussion regarding the loss reserves analyses.  Smithson reported the reserve reviews were still underway and there was no consensus at the time,  but the reserve charge could be between $60 million and $125 million.  He also stated meetings were scheduled among the three sets of analysts, and he would not know what reserve action would be taken until such meetings were completed.  As of October 30, 2003, Donnelly took the position the reserve increase should be $65 million.  There is no evidence the dividend, or any reduction or elimination thereof, was discussed at the October 30, 2003 meeting.  The third quarter analyses were not completed until October 31, 2003, at 5:15 p.m., at least six hours after Johnson and Anton spoke.

On Sunday, November 2, 2003, at 8:30 p.m., a Board of Directors meeting was held.  Schneider reported that, as a result of the analyses, management had decided PMA Re should strengthen its loss reserves by approximately $150 million.  The Board also resolved to suspend the

dividend at that meeting.

On November 4, 2003, PMA publicly announced it had completed a comprehensive review of its loss reserves and would be applying a charge of $150 million, primarily to strengthen PMA Re's loss reserves.  PMA further announced that, as a result of this reserve charge, it had decided to suspend its dividend at that time.  On November 6, 2003, PMA issued a press release announcing a net loss of $96.4 million for the third quarter of 2003.  PMA also announced it had decided to withdraw from the reinsurance business, Anton was stepping down as Chairman of the Board of Directors, and Smithson was resigning as President and Chief Executive Officer.

**DISCUSSION**

The SEC brings this case under the classical theory of insider trading liability.  "The classical theory imposes liability on corporate 'insiders' who trade on the basis of confidential information obtained by reason of their position with the corporation.  The liability is based on the notion that a corporate insider breaches 'a . . . [duty] of trust and confidence' to the shareholders of his corporation." *SEC v. Yun*, 327 F.3d 1263, 1269 (11th Cir. 2003) (quoting *United States v. O'Hagan*, 521 U.S. 642, 652 (1997)).  "The classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation."  *O'Hagan*, 521 U.S. 652.

The SEC specifically alleges Anton violated Section 17(a) of the Securities Act of 1933 (Securities Act), 15 U.S.C. § 77q(a),[9] Section 10(b) of the Securities Exchange Act (Exchange Act),

---

[9]Section 17(a) of the Securities Act provides:

> It shall be unlawful for any person in the offer or sale of any securities or any security-based swap agreement by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails,

15 U.S.C. § 78j(b),[10] and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under Section 10(b) of the Exchange Act.  Actions for securities fraud under Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 require proof of essentially the same elements.  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1466-67 (2d Cir. 1996).  To prove Anton violated these securities laws, the SEC must prove by a preponderance of the evidence, *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 389-91 (1983), that Anton, with scienter, disclosed material, nonpublic information to Johnson, an outsider of PMA, in breach of a fiduciary duty to PMA shareholders. *Chiarella v. United States*, 445 U.S. 222, 227-35 (1980); *Dirks v. SEC*, 463 U.S. 646, 653-61 (1983).

---

directly or indirectly –

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

[10]Section 10(b) of the Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

The SEC must also establish Johnson sold PMA stock while in possession of the inside information provided by Anton, Johnson knew or should have known that Anton violated a relationship of trust by relaying the inside information, and Anton benefitted from the disclosure. *Dirks*, 463 U.S. 653-61.

The SEC alleges on October 31, 2003, Anton disclosed to Johnson material, nonpublic information that PMA would be discontinuing its dividend and PMA Re would be increasing its loss reserves. Because the testimonies of Johnson or Anton in regards to their conversation cannot be credited, this Court must look to circumstantial evidence to determine whether Anton made such a disclosure. *See SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004) (stating the SEC may use direct or circumstantial evidence to prove § 10(b) violations); *SEC v. Roszak*, 495 F. Supp. 2d 875, 886 -887 (N.D. Ill. 2007) (noting the SEC is entitled to prove its case through circumstantial evidence); *SEC v. Singer*, 786 F. Supp. 1158, 1164-65 (S.D.N.Y. 1992) (noting proof of insider trading can be made through an inference from circumstantial evidence and without a direct confession).

The record lacks any evidence a dividend elimination was discussed prior to the meeting of the Board of Directors on November 2, 2003, at which the Board decided to suspend the dividend. The only evidence presented by the SEC that Anton disclosed information of a dividend elimination is Johnson's testimony of the conversation on October 31, 2003, which this Court has found not credible. Thus, the record evidence fails to show Anton knew the dividend would be eliminated when he spoke to Johnson on October 31, 2003, and therefore no conclusive evidence Anton disclosed this information in their conversation.

As to the reserves increase, although Anton was aware it was a possibility, there is no

evidence he was involved in any discussions regarding the reserves increase subsequent to September 30, 2003.  Between September 30, 2003, and October 31, 2003, the evidence shows Anton was not kept apprised of developments in the reserves analyses and was unaware of the extent of the increase being contemplated.  From the Executive Committee meeting he attended on September 30, 2003, Anton knew Donnelly had made a preliminary recommendation for a $50 million to $60 million increase in loss reserves, but at that time, Deloitte and Bickerstaff did not have any preliminary recommendations because their reserve analyses were still in progress. Donnelly's preliminary recommendation estimate was not considered dire because the company had revenues of about $1 billion at the time, a reserve charge of $50 million to $60 million would have allowed the company to report earnings for the year, and the company could reasonably expect to maintain its A-minus A.M. Best rating.  Subsequent to that meeting, there is no evidence Anton was updated on any of the three reserve analyses or their developing estimates.  The three reserve analyses were not completed until after 5:15 p.m. on October 31, 2003, and the exact amount of the reserve charge was not decided until the meeting on November 2, 2003.  The evidence shows although Anton knew an increase to PMA Re's loss reserves was a strong possibility, he was without any definite information regarding the loss reserves increase at the time of his October 31, 2003 conversation with Johnson. This Court is therefore unpersuaded it is more likely than not Anton informed Johnson PMA Re would definitely be increasing its loss reserves.

In any event, the SEC has not proven the information PMA Re would be increasing its  loss reserves was material.  The SEC showed how the information of the dividend elimination and the loss reserves increase together was material, but failed to demonstrate how information of a loss reserves increase itself was material.  Information is "material" when there is a "substantial

likelihood that a reasonable investor would view it as significantly altering the 'total mix' of information available." *United States v. Cusimam*, 123 F.3d 83, 88 (2d Cir. 1997). "Central to the issue of materiality is 'whether the tipped information, if divulged to the public, would have been likely to affect the decision of potential buyers and sellers.'" *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 166 (2d Cir. 1980).

In *Elkind*, the Second Circuit concluded a disclosure consisting of confirmation that sales were slowing was not material because the company had publicly stated a decline in sales was expected. *Id.* The Court reasoned "[t]he confirmation of these facts, which were fairly obvious to all who followed the stock and were not accompanied by any quantification of the downturns, cannot be deemed 'reasonably certain to have a substantial effect  on the market price of the security.'" *Id.* (quoting *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 15 (2d Cir. 1977). Similarly, information PMA Re would be increasing its loss reserves, unaccompanied by any quantification, and in the context of the information publicly available, cannot be considered material information.  In 2003, PMA Re's history of increasing its reserves, and the strong likelihood of it again increasing reserves at the end of 2003, was publicly known through PMA's own annual report, the annual shareholders meeting, and the Credit Suisse report.  If Anton informed Johnson PMA Re would be increasing its reserves, it was simply confirmation of a fact "fairly obvious to all who followed the stock," *id.*, and the disclosure cannot be deemed substantially likely "a reasonable investor would view it as significantly altering the 'total mix' of information available." *Cusimam*, 123 F.3d 88.  In addition, it is not alleged Anton provided any information regarding the extent of the reserve increase. The lack of any quantification bolsters the conclusion this information would not have affected the decision of potential investors. *See Elkind*, 635 F.2d 166.  It is unlikely a reasonable investor would

17

have viewed the information on October 31, 2003, that PMA Re was again increasing its reserves, without any specificity, as significantly altering the total mix of available information.

Finally, "[f]urther indication of the lack of materiality may be found in the reaction of those who were exposed to the inside information." *Id.* (citing *Lilly v. State Teachers Retirement System*, 608 F.2d 55, 58 (2d Cir. 1979), *cert. denied*, 446 U.S. 939 (1980)).   Johnson's reaction to information he learned publicly that a loss reserve increase was likely further demonstrates the alleged disclosure PMA would be increasing its loss reserves was not material.  Johnson testified that after a shareholders meeting he attended in April 2003 and after reviewing PMA's annual report, he realized PMA Re would have to increase its loss reserves substantially, and was "alarmed" by this. Johnson, however, was not prompted to sell any of his PMA shares following this realization.  This Court concludes the SEC has not met its burden to show by a preponderance of the evidence Anton disclosed material, nonpublic[11] information.[12]

Even if the evidence showed Anton disclosed material, nonpublic information, the SEC's claims fail because the SEC failed to establish Anton benefitted from the alleged disclosure.  "To state a claim for insider trading, the SEC must allege that the tipper has personally benefitted, either

---

[11]It is not disputed the information was nonpublic.

[12]The SEC presented evidence of an occasion in 1997 when Anton called another retired PMA employee, William Montone.  Anton informed Montone PMA was planning to strengthen its loss reserves, but advised Montone he should not be concerned because the strengthening would not affect the dividend.  Several weeks later, Anton distributed a memorandum to shareholders notifying them the company was planning to increase loss reserves in an effort to improve its standing and rating by A.M. Best.  At the time, PMA was not a publicly traded company.  The SEC argued the evidence showed Anton "[was] a person that is not respectful of the company's confidences and is willing to breach those confidences."  N.T. 11/12/08, 143: 24-25.  This Court finds the evidence of that incident irrelevant to the specific issues involved in this case and will disregard the proffer.

directly or indirectly, from the disclosure." *SEC v. Blackwell*, 291 F. Supp. 2d 673, 692 (2003) (citing *Dirks v. SEC*, 463 U.S. 646, 692). Without a showing the tipper acted for personal gain, there can be no insider trading violation. *Dirks*, 463 U.S. 663-64. "Absent some personal gain, there is no breach of duty to stockholders." *Id.* at 662. To prove Anton benefitted from the alleged disclosure, the SEC need not show that he "expected or received a specific or tangible benefit in exchange for the tip." *Warde*, 151 F.3d 48 -49 (citation omitted). The benefit element is satisfied when the tipper "intend[s] to benefit the . . . recipient" or "makes a gift of confidential information to a trading relative or friend." *Id.* (quoting *Dirks*, 463 U.S. 664).

The SEC concedes Anton did not personally receive any of the proceeds of Johnson's sale of PMA shares and did not expect to receive any financial benefit in exchange for the tip. The SEC maintains, however, that in light of their long history and personal relationship, Anton's knowledge of Johnson's holdings, and Anton's concern over the dividend's effect on shareholders, Anton provided the information as a gift to Johnson. Considering the nature of their relationship, it is unlikely Anton would have provided Johnson inside information as a gift. The testimonies of both Anton and Johnson support the conclusion they were not friends. To Anton, Johnson was no different from any other former employee shareholder and Anton did not consider Johnson a friend. Both also testified they had no social or personal relationship of the company shareholder relationship. Johnson had also been to Anton's home only once, did not have Anton's personal contact information other than his office phone number, and had never received a gift from Anton. Other than the general advice not to have "too many eggs in one basket," Johnson never received any financial advice from Anton. The evidence does not show Anton expected to benefit from a tip to Johnson by maintaining a good relationship or expected any meaningful future advantage. Johnson

also testified he had not spoken to Anton after the alleged disclosure, which further supports the finding Anton did not expect to, nor did he, benefit from any disclosure, even as a friend. *See, e.g.*, *SEC v. Maxwell*, 341 F. Supp. 2d 941, 947-50 (S.D. Ohio 2004) (holding executive insider did not stand to personally benefit from disclosing material, nonpublic information to his barber because there was no agreement to split profits or other pecuniary benefit; the SEC provided no evidence of a *quid pro quo*; given the parties' relative stations in life, any reputational benefit was unlikely to have translated into any meaningful future advantage; there was no evidence tipper had any reason or intent to give a gift; there was no family relationship or close friendship between the tipper and tippee; tipper and tippee did not socialize outside of tipper's haircut appointments; and there was no history of substantial loans or personal favors between tipper and tippee); *Cf. Yun*, 327 F.3d 1280-81 (holding, where tipper and tippee were friendly, worked together for several years, and split commissions on real estate transactions over the years, evidence sufficient to show tipper expected to benefit from tip by maintaining a good relationship between a friend and frequent partner in real estate deals). Because there is no evidence Anton received a personal benefit from the alleged disclosure, there can be no insider trading violation.

As to the remaining elements, because the SEC failed to meet its burden in establishing by a preponderance Anton disclosed material, nonpublic information, there can be no finding of scienter or breach of a fiduciary duty. Scienter is an "intent to deceive, manipulate, or defraud." *Dirks*, 463 U.S. 664 n.23. (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). "One who deliberately tips information which he knows to be material and nonpublic to an outsider who may reasonably be expected to use it to his advantage has the requisite scienter." *Elkind*, 635 F.2d 167. Because this Court concludes Anton did not tip material, nonpublic information to an outside, Anton

cannot be found to have acted with any deceptive, manipulative, or fraudulent intent.

It is further undisputed Anton, as Chairman of the Board of Directors, was a corporate insider with a fiduciary duty to PMA's shareholders. Corporate insiders are generally officers, directors, or controlling stockholders. *In the Matter of Cady, Roberts & Co.* 1961 WL 60638 at 3, 40 S.E.C. 907 (1961). "A corporate insider who tips confidential information clearly violates a fiduciary obligation." *Elkind*, 635 F.2d 165 (citing *Chiarella*, 445 U.S. 229 n.12). "[T]here must be a breach of the insider's fiduciary duty before the tippee inherits the duty to disclose or abstain." *Dirks*, 463 U.S. 664. Because the SEC, however, has failed to show Anton tipped any confidential information, a violation of his fiduciary duty cannot be established.

**CONCLUSIONS OF LAW**

The SEC failed to establish by a preponderance of the evidence Anton disclosed material, nonpublic information and benefitted from the alleged disclosure. Without establishing Anton disclosed material, nonpublic information, there can be no finding Anton acted with scienter or that Anton breached a fiduciary duty to PMA shareholders. Therefore, the SEC has failed to show Anton violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5.

Accordingly, this Court will enter in a separate order judgment in favor of Defendant Frederick W. Anton, III, and against Plaintiff Securities and Exchange Commission.